UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
In re: LYONDELL CHEMICAL CO., et al.     :
                                         :
                Debtors.                 :
                                         :      OPINION AND ORDER
---------------------------------------- :
                                         :
EDWARD S. WEISFELNER, as Litigation      :
Trustee of the LB Litigation Trust,      :
                                         :
                Plaintiff-Appellant,     :
                                         :      17cv4375(DLC)
                -v-                       :
                                         :
LEONARD BLAVATNIK, et al.,               :
                                         :
                Defendants-Appellees.    :
                                         :
---------------------------------------- X

**<u>APPEARENCES</u>**:

For the Plaintiff-Appellant:
Michael K. Kellogg
Gregory G. Rapawy
Daniel G. Bird
Daniel V. Dorris
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, DC 20036

Sigmund S. Wissner Gross
May Orenstein
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, Massachusetts 02111

For the Defendants-Appellees:
Richard I. Werder, Jr.

Susheel Kirpalani
David Cooper
Rex Lee
Victor Noskov
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

Kenneth N. Klee
Whitman L. Holt
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of The Stars, 39th Floor
Los Angeles, California 90067

DENISE COTE, District Judge:

This appeal arises out of the leveraged buyout ("LBO") and ensuing bankruptcy of Lyondell Chemical Company ("Lyondell"). In December 2007, Lyondell was acquired in an LBO by Basell B.V. ("Basell"), a Netherlands-based petrochemical company. The LBO was arranged by Basell's indirect owner, Access Industries, Inc. ("Access"[1]), which, in turn, is owned by Leonard Blavatnik, an American multi-billionaire. Three months later, in March 2008, Lyondell was in need of additional liquidity, and obtained a $750 million revolving credit facility from Access, now known as the "Access Revolver." Lyondell first drew on the Access Revolver for $300 million in October 2008, and repaid that draw over the next 5 days. A few months later, in December 2008, while on the brink of bankruptcy, Lyondell sought to draw the full amount of the Access

---

[1] Access has many subsidiaries and affiliates, but because the distinction between Access and its subsidiaries is immaterial on appeal, they are referred to here as "Access."

Revolver.  Access refused.  A week later, Lyondell filed a petition for Chapter 11 bankruptcy relief.

Edward S. Weisfelner, appointed by the bankruptcy court as Litigation Trustee of the LB Litigation Trust (the "Trustee"), pursued numerous claims against Access and Blavatnik.  Two of these claims are now the subject of this appeal.

First, the Trustee claims that Access breached the Access Revolver agreement by failing to lend pursuant to its terms in December 2008.  Although at trial, the Trustee proved that Access breached the agreement, the bankruptcy court had held on Access's motion to dismiss that a provision of the agreement that limited its liability for damages was enforceable.  The Trustee has appealed that ruling, and in the alternative, challenges the amount of the bankruptcy court's damages award.

Second, the Trustee seeks to recover the October 2008 repayments on the Access Revolver as avoidable preference payments.  On summary judgment, the bankruptcy court held that the Trustee had proven four of the five elements of the claim.  But on the last element, that Lyondell was insolvent when the repayments were made, the court ruled at trial that the Trustee failed to carry its burden to prove that insolvency.  The Trustee now challenges that ruling, on both legal and factual grounds.  For the following reasons, the bankruptcy court's judgment is affirmed in all respects, except as to its calculation of damages.

## BACKGROUND

The following facts are primarily drawn from the bankruptcy court's findings of fact after trial, and are not contested on appeal except where noted. Only those facts relevant to the issues on appeal are discussed below; further detail can be found in the bankruptcy court's thorough and well-reasoned April 21, 2017 opinion, In re Lyondell Chem. Co., 567 B.R. 55 (Bankr. S.D.N.Y. 2017) ("Trial Opinion"), with which familiarity is presumed.

Leonard Blavatnik, an American multi-billionaire, is the 100% owner of the Access group of companies. Id. at 69. In 2005, the Access group acquired Basell, a Netherlands-based petrochemicals company. Id. at 70. Soon after acquiring Basell, Blavatnik began to pursue combining Basell with an American refining company, with the goal of building a global petrochemical and refining company. Id. at 71. Among the acquisition targets Access identified was Lyondell. Id.

Access and Basell made various offers to acquire Lyondell over the course of 2006 and 2007. Id. at 72. These offers began at a price of approximately $24 to $27 per share of Lyondell, and steadily increased from there. Id. at 72-73. In early 2007, Blavatnik and Access began seriously evaluating an offer to purchase Lyondell at $38 dollars per share. Id. Some members of Blavatnik's team expressed concerns about the amount of leverage

needed to consummate a deal at that price, noting that in the

"downside case," the resulting company could end up in financial

distress.  Id.  Despite the substantial analysis and modeling

Access undertook at the $38 per share price, no deal was

consummated.  Id.

In May 2007, Access acquired an 8.3% position in Lyondell, in

order to increase the pressure on Lyondell to negotiate with

Basell.  Id.  By July 9, 2007, Blavatnik and Lyondell's CEO, Dan

Smith, had reached a tentative arrangement for Basell to acquire

Lyondell at a price of $48 per share.  Id. at 76.  At trial, the

Trustee presented evidence that this price was perceived

internally at Access as too high, because it would not provide

sufficient upside for Access in view of the payments necessary to

service the required debt load.  Id. at 76-77.  Nonetheless, the

merger agreement between the Basell and Lyondell companies was

signed on July 16, 2007.  Id. at 77.

After the merger agreement was signed, financing needed to be

arranged.  Five major banks each committed billions of dollars to

finance the merger, and each made internal projections for the

resulting company based on non-public information regarding both

Basell and Lyondell.  Id. at 79, 87-89.  Each of these banks

engaged in an extensive diligence process commensurate with the

lending exposure they were undertaking.  Id. at 87-89.  The

bankruptcy court particularly focused on two models, one from

Citibank, and one from Merrill Lynch, which each showed that they believed the debt associated with the merger was an acceptable risk.  Id. at 90-91.

The merger closed on December 20, 2017.  Id. at 79.  As the bankruptcy court aptly described it, the deal involved elements both of a merger and acquisition, as well as leveraged finance. Id.  Under the merger, Basell contributed its equity and borrowed funds from financing banks to purchase Lyondell, with the bank loans secured against the assets of the combined company.  Id. at 79-80.  Lyondell's previous shareholders and debtholders received approximately $19.63 billion as part of the transaction.  Id. at 80.  Contemporaneous with the closing, Citibank had prepared a valuation showing the Basell company assets were worth approximately $10-12 billion, which the bankruptcy court credited. Id. at 80.

After the closing, Basell renamed itself Lyondell Basell Industries ("LBI"), and Lyondell became one of LBI's subsidiaries. Id.  Lyondell's liquidity and capital resources were then integrated into LBI.  Id. at 81.

By early 2008, LBI began experiencing significant liquidity issues.  Id.  LBI had $2.3 billion in liquidity at the close of the merger, but by February 2008, that cushion had dwindled to $895 million.  Id.  Although LBI had ordinary seasonal needs that tended to negatively impact first quarter liquidity, a rise in oil

prices, a sales decline, and various other unexpected costs caused liquidity to decrease more than anticipated.  Id.  When the merger was first discussed, the participants contemplated that an additional unsecured revolving line of credit for LBI could become necessary, but the events of the first quarter necessitated its implementation.  Id.

On March 27, 2008, Lyondell and LBI entered into a $750 million unsecured revolving credit facility with Access: the Access Revolver.  Id. at 84-85.  LBI paid an approximately $12 million commitment fee to Access for setting up the facility.  Id. at 151.  Under the terms of the Revolver, Lyondell was entitled to borrow on one day's notice to Access.  Id. at 85.  Once it had borrowed, Lyondell was entitled to hold the money until September 28, 2009, but could voluntarily repay earlier on one day's notice. Id.  Commensurate with the higher risk associated with lending on an unsecured basis, the Access Revolver was the one of the highest interest rate credit facilities LBI and Lyondell had available. Id. at 86.

Among the clauses included in the Access Revolver was Section 9.05, which purported to limit the liability of the parties to the agreement.  Section 9.05 reads:

> Whether or not the transactions contemplated hereby
> are consummated, the Borrowers shall, jointly and
> severally, indemnify and hold harmless the Lender
> and its Affiliates . . . (collectively, the
> "Indemnitees") from and against any and all

7

liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses, and disbursements (including attorney costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance, or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Revolving Credit Commitment or Loan or the use or proposed use of the proceeds therefrom . . . or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort, or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "Indemnified Liabilities"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; _provided_ that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee . . . as determined by the final judgment of a court of competent jurisdiction.  [No Indemnitee] or the Borrowers or any Subsidiary [shall] have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date).

(Emphasis supplied.)

In early April 2008, LBI contemplated borrowing on the Access Revolver, to the considerable consternation of Access.  Id. at 85. The draw never ended up occurring, largely because around the same time, LBI was able to "upsize" certain other lending facilities it had available.  Id. at 85-86.  These lenders were only willing to increase their commitments if the Access Revolver was in place, but once the Access Revolver was implemented, they promptly did so.  Id.

In October 2008, LBI again experienced liquidity problems. Id. at 86.  Through the summer of that year, LBI faced significant headwinds.  LBI's turnaround plan for its Houston refinery was prolonged by a serious crane accident.  Id.  Then two hurricanes caused LBI's Gulf Coast chemical plants to remain idle for most of September 2008.  Id.  And the beginnings of the Great Recession began having an impact when $175 million of LBI's cash equivalents, held in a money market account, were frozen due to the Lehman Brothers bankruptcy.  Id.  With no other liquidity available, Lyondell drew $300 million from the Access Revolver on October 15, 2008 (the "October Draw").  Id.  Lyondell expected to pay the draw back in a matter of days.  The repayments accordingly took place in equal installments on October 16, 17, and 20, 2008 (the "October Repayments").

Meanwhile, the global economic collapse in the fall of 2008 had an extremely serious, negative impact on LBI's business, after

the October Repayments.  Id. at 86.  On December 30, 2008, while

on the brink of bankruptcy, LBI submitted a draw request for the

full $750 million available under the Access Revolver.  Id.  The

next day, Access refused to lend.  Id.  On January 6, 2009,

Lyondell filed for bankruptcy, and LBI joined it a few months

later.  Id. at 69.

The Trustee, in his operative complaint, made various

allegations about the negotiation and performance of the Access

Revolver.  Although the bankruptcy court did not need to reach the

factual validity of these allegations in light of its ruling on

motion to dismiss, these allegations remain relevant to review of

that ruling.  The gravamen of the Trustee's additional allegations

concern the allegedly one-sided negotiation process for the Access

Revolver, and the imposition of extra-contractual conditions on

its use beyond the written terms of the agreement.  Thus, for

example, the Trustee alleged that Access never wanted to be a

lender to LBI; that it imposed an extra-contractual requirement

that any draws be repaid immediately as soon as funds were

available; and otherwise attempted to discourage use of the Access

Revolver.  The Trustee also alleged that, in December 2008, Access

failed to lend to LBI because it preferred to lend on more

favorable terms after the bankruptcy petition rather than as a

general unsecured creditor.  The complaint alleges that Access was

well aware of LBI's precarious financial situation when it failed to lend.

PROCEDURAL BACKGROUND

Lyondell's bankruptcy petition was filed on January 6, 2009. Id. at 69. In July 2009, the Official Committee of Unsecured Creditors commenced an adversary proceeding against, inter alia, Blavatnik, Access, and affiliated companies. In early 2010, the bankruptcy court approved a final plan of reorganization for LBI and Lyondell. Id. at 61 n.1. Under the plan, the claims of LBI and Lyondell were assigned to the LB Litigation Trust. Edward S. Weisfelner was appointed as Trustee, and took over the adversary proceeding from the Committee.

The operative complaint for the claims on appeal is the Trustee's second amended complaint, filed on September 29, 2011. Id. at 67. As relevant here, the Trustee brought claims for breach of contract arising out of Access's failure to lend in December 2008, and to recover the October Repayments as avoidable preference payments. It bears noting, however, that these two claims were part of a massive litigation involving numerous additional claims, all resolved against the Trustee, as to which the Trustee has not appealed.

On January 4, 2016, the bankruptcy court ruled on defendants' motion to dismiss with respect to the breach of contract claim. See In re Lyondell Chem. Co., 544 B.R. 75 (Bankr. S.D.N.Y. 2016)

11

("Dismissal Opinion").  The bankruptcy court held that Section
9.05 was enforceable as to all damages other than restitution
damages.  Id. at 92.  Starting from the proposition that
limitation-of-liability clauses are generally enforceable under
New York law unless an exception applies, it found that the
Trustee had failed to plausibly plead either that there was a
disparity in bargaining power, or that the Kalisch-Jarcho
exception for gross negligence or intentional wrongdoing applied.
Id. at 86, 90.  It also saw no possibility that any defects in the
Trustee's allegations could be cured through amendment.  Id. at
104-05.  The bankruptcy court also found, however, that the plain
language of Section 9.05 of the Access Revolver agreement did not
preclude the Trustee from recovering restitutionary damages, and
permitted the Trustee to proceed on the breach of contract claim
to that extent.  Id. at 92.

On July 20, 2016, the bankruptcy court resolved cross motions
for summary judgment on the avoidable preference claim.  The
bankruptcy court ruled that the Trustee had satisfied all of the
elements of the avoidable preference claim as a matter of law,
other than proving that LBI was insolvent when the October
Repayments were made.  On that issue, the bankruptcy court ruled
that the defendants had submitted some evidence tending to show
that LBI was solvent.  It therefore found that the statutory
presumption of insolvency, which, in the absence of any evidence

12

to the contrary, is sufficient to find that the debtor was
insolvent within 90 days of a bankruptcy filing, see 11 U.S.C. §
547(f), had been rebutted, and that triable issues of fact
remained on the insolvency question.

The case then proceeded to trial.  The trial took place over
14 days in October and November 2016, with closing arguments in
February 2017.  The bankruptcy court issued findings of fact and
conclusions of law on April 21, 2017.

On the breach of contract claim, the bankruptcy court found
that the Trustee had proven that Access breached the contract.
Trial Opinion, 567 B.R. at 150.  In accordance with the ruling on
the motion to dismiss, the bankruptcy court awarded only
restitution damages.  Id. at 151.  After noting the lack of
argument on either side of the issue, the bankruptcy court found
that the most equitable method to calculate restitution damages
was to estimate them as the commitment fee paid by LBI and
Lyondell, less 40% of that fee, to account for the benefit
Lyondell received from the October Draw.  Id.

On the avoidable preference claim, the bankruptcy court, in
contrast to its summary judgment ruling, found that the relevant
debtor for the purposes of the claim was Lyondell, not LBI.  Id.
at 148.  It also held that because the statutory presumption was
defeated on summary judgment, it was the Trustee's burden to prove
insolvency by a preponderance of the evidence, without the

presumption.  Id. at 118.  Notably, the Trustee made statements at trial indicating that the presumption had disappeared from the case.  After examining the testimony of the Trustee's valuation expert, Anders Maxwell, the court ruled that the testimony was unreliable and either excluded it or accorded it no weight.  Id. at 104-07.  The court also ruled that certain e-mails cited by the Trustee were insufficient to demonstrate insolvency.  Id. at 149. Therefore, the bankruptcy court found that the Trustee had failed to produce any evidence tending to show that Lyondell was insolvent on the critical dates.  Id.

The bankruptcy court entered a final judgment on May 15, 2017.  The Trustee timely filed a notice of appeal on June 9.  The appeal became fully submitted on September 29.[2]

### DISCUSSION

"On appeal, a district court reviews the bankruptcy court decision 'independently,' accepting its 'factual conclusions unless clearly erroneous but review[ing] its conclusions of law de novo.'"  In re Lyondell Chem. Co., 554 B.R. 635, 644 (S.D.N.Y. 2016) (quoting In re Johns-Manville Corp., 759 F.3d 206, 214 (2d Cir. 2014)) (alteration in original).  To the extent an issue is

---

[2] After examination of the briefs and the record, the Court deems oral argument unnecessary because the facts and legal arguments are adequately presented therein, and the decisional process would not be significantly aided by oral argument.  See Fed. R. Bankr. P. 8019(b).

committed to the bankruptcy court's sound discretion, the bankruptcy court's decision is reviewed for abuse of that discretion.  See generally United States v. Continental Illinois Nat. Bank and Trust Co., 889 F.2d 1248, 1254 (2d Cir. 1989).

### I.    Breach of Contract

#### A. Enforceability of Section 9.05

##### 1. Legal Principles Applicable to Review of a Motion to Dismiss

The Trustee first challenges the bankruptcy court's dismissal of the breach of contract claim, to the extent it sought more than restitution damages.  Rule 7012(b), Fed. R. Bankr. P., provides that Rule 12(b), Fed. R. Civ. P., applies in bankruptcy proceedings.  As a purely legal issue, the bankruptcy court's decision on the motion to dismiss is reviewed de novo.  See Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015).

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts, which, taken as true, state a plausible claim for relief."  Keiler v. Harlequin Enterprises Ltd., 751 F.3d 64, 68 (2d Cir. 2014).  "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Bascunan v. Elsaca, 874 F.3d 806, 814 n.23 (2d Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "'The plausibility standard is not akin to a

probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017) (quoting Iqbal, 556 U.S. at 678)).

### 2. New York's Standard for Invalidating a Limitation of Liability Clause

The Trustee contends that the bankruptcy court erred in holding, on defendants' motion to dismiss, that the Trustee had failed to plead allegations that could render Section 9.05 unenforceable. The Access Revolver provides, and the parties agree, that New York law governs the determination of whether the clause is enforceable. Under New York law, generally, "[c]ontract provisions limiting remedies are enforceable unless they are unconscionable." Biotronik A.G. v. Conor Medsystems Ireland, Ltd., 11 N.E.3d 676, 679 n.4 (N.Y. 2014). Thus, "New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed." Process Am., Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 138 (2d Cir. 2016). A limited exception to this principle, known as the Kalisch-Jarcho doctrine, and reflected in

16

the terms of Section 9.05, exists when a party "in contravention of acceptable notions of morality," engages in conduct that smacks of "intentional wrongdoing." Kalisch-Jarcho, Inc. v. City of New York, 448 N.E.2d 413, 416 (N.Y. 1983). In such cases, a limitation-of-liability provision is rendered unenforceable, in this case by the terms of the contract itself, and even if not, as a matter of New York's public policy.

The bankruptcy court recognized, and the Trustee argues for, another exception to the general enforceability of a limitation-of-liability clause: if the limitation-of-liability clause was the result of unequal bargaining power. In recognizing this exception, the bankruptcy court relied on dicta from a number of decisions of this district. See Dismissal Opinion, 544 B.R. at 85 (citing CAMOFI Master LDC v. College P'Ship, Inc., 452 F. Supp. 2d 462, 478 (S.D.N.Y. 2006)); DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 317 (S.D.N.Y. 2002); Indus. Risk Insurers v. Port Auth. Of N.Y. & N.J., 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005)). None of these cases, however, invalidated a contractual limitation-of-liability on the basis that it was the result of unequal bargaining power, without consideration of the underlying fairness of the clause. Even assuming the Trustee adequately pled disparity in bargaining power, that is not enough under New York law.

The leading New York case on limitation-of-liability clauses, Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 643 N.E.2d 504, 507 & n.* (N.Y. 1994) recognizes an exception to the general enforcement of limitations-of-liability only for adhesion contracts or misconduct.  The exception for adhesion contracts does not help the Trustee.  In order for a contract to be deemed adhesive under New York law, in addition to severe procedural unfairness not present here, it must also be substantively unfair, either "because [the] terms are not within the reasonable expectations of that party, or because its terms are unduly oppressive, unconscionable, or contrary to public policy." Aviall, Inc. v. Ryder System, Inc., 913 F. Supp. 826, 831 (S.D.N.Y. 1997); see Matter of Ball (SFX Broadcasting Inc.), 665 N.Y.S.2d 444, 446-47 (3d Dep't 1997) (citing Aviall, 913 F. Supp. at 831).  Mere inequality in bargaining power, without any consideration of the underlying fairness of the challenged clause, cannot suffice to invalidate a limitation-of-liability provision.

Accordingly, the Trustee had to plausibly allege either that the limitation of liability clause was unconscionable or unduly oppressive, or that the defendants' conduct amounted to conduct egregious enough to trigger the Kalisch-Jarcho exception.  Of course, as described below, disparity in bargaining power is a component of an unconscionability analysis, but it cannot alone suffice to invalidate a contractual provision.

### 3. Unconscionability

The Trustee did not argue to the bankruptcy court that Section 9.05 was unconscionable, but urges on appeal that he pled sufficient facts to plausibly allege that Section 9.05 was unconscionable. "Under New York law, a contract is unconscionable when it is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115, 121 (2d Cir. 2010) (citation omitted). "In general, a provision will be deemed unenforceable on unconscionability grounds only where it is both procedurally and substantively unconscionable when made," except for "exceptional cases where a provision of a contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." NML Capital v. Republic of Argentina, 621 F.3d 230, 237 (2d Cir. 2010) (citation omitted).

> The procedural element of unconscionability requires an examination of the contract formation and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was a disparity in bargaining power.

Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828 (N.Y. 1988) (citation omitted). By contrast, the substantive element of

unconscionability "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." Id. at 829. Courts are to consider the "commercial context," "purpose", and "effect" of any challenged terms. Id. In sum, "[a] contract or clause is unconscionable where there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 207 (2d Cir. 1999) (citation omitted).

Because the Trustee did not plausibly plead that Section 9.05 is substantively unconscionable, it is not unenforceable as unconscionable. The terms of Section 9.05 do not render the Access Revolver so unbalanced or oppressive that it should be set aside. As recognized by the bankruptcy court, Section 9.05 either entitled LBI and Lyondell to a refund of the expenses they incurred entering into the Access Revolver (less the value of the benefits they had already received), or to the benefit of obtaining liquidity at a fair price from Access. Under either result, Lyondell was not worse off for having entered into the transaction.[3] In these circumstances, Section 9.05 and the Access

_____

[3] In fact, there is trial evidence that LBI and Lyondell substantially benefited from entering into the Access Revolver before they attempted to draw any money from it. Had LBI and Lyondell not had the Access Revolver available, they would have

Revolver as a whole did not so favor Access as to render it unduly oppressive.

The Trustee argues that because the defendants had no exposure to consequential damages, they could honor the Access Revolver only when they liked, while Lyondell and LBI had no options given their dire financial condition, and paid as if the Access Revolver imposed real obligations. But the limitation was not unreasonably favorable to Access. It was sufficient to restore Lyondell and LBI to at least the position that they would have been but for entering into the revolver. LBI and Lyondell therefore could not have suffered significant harm as a direct result of entering into the Access Revolver. This is not to say that providing restitutionary damages in every case suffices to render a limitation-of-liability clause enforceable, but where, as here, the Access Revolver effectively conferred a benefit on LBI and Lyondell, limiting the scope of that benefit in this manner does not render the contract unconscionable.

The Trustee also attempts to compare the Access Revolver to the contract at issue in Blackrock Capital Investment Corp. v. Fish, 799 S.E.2d 520 (W. Va. 2017). In that case, applying New York law, the court found exculpatory clauses in a contract between a parent and subsidiary unenforceable. Id. at 533. But

---

never been able to upsize other credit facilities, and had even greater liquidity problems.

the clauses and contracts at issue in that case were fundamentally different.  In Blackrock, the subsidiary was required to pay substantial fees for management services to two parent corporations, with absolutely no recourse available if the parent companies failed to perform under the agreement.  Id. at 532.  The clauses went as far as to effectively preclude lawsuits for breach of the agreement.  Id. at 531-32.  And, the subsidiary was required to indemnify the parents for any conduct the parents undertook pursuant to the agreements, even if that conduct was wrongful, with effectively no ability to supervise the parents' performance or otherwise control their activities.  Id.  By contrast, the Access Revolver did not prevent Lyondell or LBI from obtaining other funding, and provided sufficient damages exposure to prevent Lyondell or LBI from being significantly harmed as a result of having entered into the Access Revolver.  The agreements at issue in Blackrock may have rendered the subsidiary there a "hapless pawn destined for sacrifice on the altar of corporate law," id. at 533, but the Access Revolver cannot be so described.  The Access Revolver was not substantively unconscionable.

### 4. Kalisch-Jarcho

The Trustee also contends that he pled sufficient allegations to trigger the Kalisch-Jarcho exception.  "[I]t is New York's public policy that a party cannot 'insulate itself from damages caused by grossly negligent conduct.'"  Abacus Federal Savings

Bank v. ADT Security Services, Inc., 967 N.E.2d 666, 669 (N.Y.

2012) (quoting Sommer v. Federal Signal Corp., 593 N.E.2d 1365,

1370 (N.Y. 1992)).  "Gross negligence, when invoked to pierce an

agreed-upon limitation of liability in a commercial contract, must

'smack of intentional wrongdoing.'"  Sommer, 593 N.E.2d at 1371

(quoting Kalisch-Jarcho, 448 N.E.2d at 413).[4]  Intentionally

breaching a contract for reasons of economic self-interest,

without more, does not rise to the level of intentional

wrongdoing.  Noble Lowndes, 643 N.E.2d at 509; see Process Am.,

839 F.3d at 138-39.  As the bankruptcy court recognized, an

additional requirement set out in the case law is that the claimed

misconduct must be tied to the particular breach of contract

alleged in the complaint -- allegations of unrelated misconduct

---

[4] In reply, the Trustee relies on Abacus to suggest that "gross
negligence or reckless indifference" is enough to trigger the
Kalsch-Jarcho exception.  But Abacus did not overrule prior law --
in fact, it recognized that "gross negligence" must "smack of
intentional wrongdoing."  Abacus, 967 N.E.2d at 669 (citation
omitted).  Abacus is therefore entirely consistent with the
principles outlined here.  The facts of Abacus are also
inapposite.  The case involved a breach of contract suit between a
bank and the provider of its security system for damages arising
out of a bank robbery, where the security system provider was
alleged to have known for weeks that its system had failed,
without notifying the bank.  Id. at 668.  The court held that the
security system provider's gross negligence or reckless
indifference was sufficient to trigger the exception.  Id. at 669-
70.  Exposing a bank to risk of an unsecured bank robbery clearly
rises to the level of gross negligence, particularly in light of
the special duty of care that necessarily arises in that type of a
contractual relationship.  No similar special duty arises in an
agreement to lend.

during the formation or performance of the contract do not

suffice.  See Dismissal Opinion, 544 B.R. at 89 (citing Noble

Lowndes, 643 N.E.2d at 509).

The Trustee's complaint fails to state plausible allegations

that the defendants engaged in misconduct sufficient to trigger

the Kalisch-Jarcho exception.  The Trustee's allegations primarily

concern misconduct unrelated to the breach at issue here, such as

Access's imposition of extra-contractual requirements

necessitating prompt repayment of any draws under the Access

Revolver, and Access's limitation of LBI and Lyondell's right to

draw on the Access Revolver to emergencies.  The bankruptcy court

correctly recognized that such allegations are not sufficiently

related to the specific breach of the contract at issue here so as

to constitute actionable misconduct.  Dismissal Opinion, 544 B.R.

at 88.  Of the allegations tied to the particular breach at issue

here -- the refusal to lend in December 2008 -- the complaint

contains no allegations that Access did anything other than

intentionally fail to perform under the contract.  Noble Lowndes

is clear that, in the context of intentional breach, unless there

is some intention to inflict harm on the other party through

breaching, or the breach is independently tortious, Kalisch-Jarcho

does not apply.  As the bankruptcy court correctly explained, the

desire of the Access Defendants to become post-petition lenders

does not itself plausibly allege that there was an intention to

inflict harm on Lyondell or LBI.  _Dismissal Opinion_, 544 B.R. at
88.  The complaint fails to plausibly plead intentional
wrongdoing.

The Trustee primarily relies on three cases in arguing that
it pleaded intentional wrongdoing linked to the alleged breach: _In
re Delphi Corp._, 2008 WL 3486615, at *6, 17-21 (Bankr. S.D.N.Y.
Aug. 11, 2008); _CAMOFI Master LDC v. College Partnership, Inc._,
452 F. Supp. 2d at 478 (S.D.N.Y. 2006); and _Banc of America
Securites LLC v. Solow Bldg. Co. II, L.L.C._, 847 N.Y.S. 2d 49, 52
(1st Dep't 2007).  _Delphi_ and _CAMOFI_ both bear some resemblance to
this case, but both involved intent to inflict harm or
independently tortious misconduct, and grave misconduct at that.
In _Delphi_, as well-described by the bankruptcy court here, the
investors "terminated the debtor's exit-financing agreement hours
before the closing," attempted to prevent "Delphi [from obtaining]
the third party financing that was required to consummate Delphi's
Chapter 11 plan," "had its counsel assert a specious claim that
Delphi not only had breached [the agreement] but also was liable
for an $82.5 million Alternate Transaction Fee," and generally
worked to "sabotage Delphi's efforts to obtain alternate
financing." _Dismissal Opinion_, 544 B.R. at 87-88 (citing _Delphi_,
2008 WL 3486615 at *5-7).  Such conduct is independently tortious
and plainly demonstrates a desire to inflict harm.  Similarly, in
_CAMOFI_, the borrower was locked into an exclusive financing

25

agreement with the lender, and through that agreement, the lender then attempted to inflict financial harm on the borrower.  CAMOFI, 452 F. Supp. 2d at 469; see also id. at 478 (lender "willfully abandoned [borrower] once it had locked [borrower] into the bridge financing" and "threatened [borrower] directly and through third parties[] with financial harm.")

Nothing in the Access Revolver, or in the course of performance of the Access Revolver alleged in the Trustee's pleading, prevented Lyondell or LBI from obtaining other financing on market terms, nor did the Trustee plausibly allege that Access attempted to hinder that effort through any imposition of the Access Revolver.  To be sure, other lenders may not have wanted to lend to Lyondell or LBI on an unsecured basis because of their precarious financial situation -- and that may even have been the fault of the defendants -- but none of these harms were due to the Access Revolver.  Merely deciding not to perform the Access Revolver because it became economically disadvantageous to do so does not constitute the type of intentional misconduct required to invalidate Section 9.05.

Solow presents closer questions.  In Solow, the First Department, by a 3-2 vote, found the Kalisch-Jarcho exception satisfied in a case where a management company demanded extra-contractual payments in exchange for performing a duty which it was already obligated to perform under a lease agreement.  847

N.Y.S. 2d at 55-57.  Characterizing the demand as reflecting "an

intention to inflict monetary harm," it held that the conduct

"renders the limitation on recovery contained in the lease

unenforceable as a matter of public policy."  Id. at 57.  The

dissent, by contrast, argued that the conduct was insufficient to

constitute intentional misconduct under Kalisch-Jarcho, on the

ground that the lessee had more than adequate recourse to protect

itself under the lease agreement, and because conduct motivated by

economic self-interest is not intentional misconduct.  Id. at 60-

61 (McGuire, J., dissenting).  The Solow majority's opinion, to

the extent it can be read to suggest that intentional breach of a

contract, without more, may result in non-enforcement of an

exculpatory clause, has been criticized by other courts as

inconsistent with Noble Lowndes.  See Process Am., 839 F.3d at 139

n.7 (noting disagreement and collecting cases).  Similarly, to the

extent Solow states that "ulterior motives" or a desire to take

economic advantage of a contractual counterparty are sufficient to

trigger the exception, that too is inconsistent with Noble

Lowndes.  Solow is best understood as a reflection of the common-

law of contract view that, although a party to a contract always

has the right to breach and pay damages rather than perform, he

may not demand additional consideration to perform duties he is

already obligated to perform.  Intentional breach of a contract to

lend, even if, as the Trustee alleges here, partially motivated by

27

a desire to act as a post-petition lender, is not contrary to the rights afforded to a party to a contract to refuse to perform, and therefore is not analogous to the situation in Solow. The Trustee therefore failed to plead that Section 9.05 is unenforceable under the Kalisch-Jarcho exception.

### 5. Leave to Amend

Finally, the Trustee asserts that he should have been permitted to amend his complaint to assert additional allegations relating to this claim. Denial of leave to amend a complaint is reviewed for abuse of discretion. See Continental Illinois Nat'l Bank, 889 F.2d at 1253.

The Trustee's first set of additional allegations relate to the degree of control between Blavatnik and LBI and the extracontractual conditions placed on use of the Access Revolver. Because, as the Trustee himself claims, these allegations relate to the degree of control that the defendants had over LBI, the disparate bargaining power of the parties, and the negotiation of the Access Revolver, they do not establish substantive unconscionability or intentional misconduct. The second set of additional allegations, relating to the defendants' knowledge of LBI's precarious financial situation, similarly do not plausibly plead that they acted in a manner prohibited by the Kalisch-Jarcho exception, because they do not plead that the breach of contract was independently tortious or reflected a desire to inflict harm

on Lyondell or LBI.  Therefore, leave to amend would have been futile, and the bankruptcy court's decision denying leave to amend is affirmed.

**B. The Amount of Restitutionary Damages**

The Trustee also argues that the bankruptcy court's assessment of the amount of restitutionary damages was flawed.[5] Under New York law, restitution damages for breach of contract are permitted in certain circumstances as an alternative to expectation or reliance damages.  See Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971); Restatement (Second) of Contracts §§ 344, 373.  Where, as here, restitution damages are deemed appropriate, they are calculated either by determining the reasonable value of the plaintiff's performance, or by the extent of the benefits conferred on the defendant, less the reasonable value of any partial performance received by the plaintiff.  See Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 730 (2d Cir. 1992); Farash v. Sykes Datatronics, Inc., 452 N.E.2d 1245, 1248 (N.Y. 1983) ("the plaintiff's recovery [in restitution] is for the reasonable value of services rendered, goods delivered, or

---

[5] The defendants contend that the Trustee waived this issue for appeal by failing to include it on their Rule 8009, Fed. R. Bankr. P., statement of issues for appeal.  The issue has been fully briefed by the parties, and no prejudice appears to have resulted from the failure to include the issue.  Accordingly, the Court declines to find the issue waived for appellate consideration.

property conveyed less the reasonable value of any counter-performance received by him.").

Although the issue has not been definitively decided by the New York courts, there is sufficient authority to predict that New York's highest court will place the burden on the defendant to prove the value of any counter-performance received by the plaintiff.  In People v. Tzitzikalakis, in the context of interpreting New York's criminal restitution provisions, the judges of the Court of Appeals unanimously expressed views signifying that the defendant is in the best position to show the existence and value of any offset to a restitution award, and therefore that the burden of proof on these issues should be on the defendant.  864 N.E.2d 44, 47 (N.Y. 2007); id. at 48-49 (Smith, J., dissenting).  Although the majority nonetheless viewed the specific criminal statutory provisions at issue as placing the burden of proof on the prosecution, it called for legislative reform to place the burden on the defendant.  Id. at 47 (majority opinion).  No similar statutory hurdle governs this case.  More broadly, burdens of proof are usually allocated to the party that "in general is in a better position" to come forward with evidence.  Miles Metal Corp. v. M.S. Havjo, 494 F.2d 563, 565 (2d Cir. 1974); see Boluk v. Holder, 642 F.3d 297, 303 (2d Cir. 2011).  Because defendants are almost always in a better position than plaintiffs to prove the existence and value of their counter-

performance, this Court predicts that, if the New York Court of
Appeals were to be presented with the issue, it would hold that
the burden of proof would be on the defendant to show the
existence and value of any claimed counter-performance. See
Giuffre Hyundai, Ltd. v. Hyundai Motor Am., 756 F.3d 204, 209 (2d
Cir. 2014) (citing DiBella v. Hopkins, 403 F.3d 102, 111 (2d Cir.
2005)). Therefore, the burden was on the defendants to prove the
value of their counter-performance.

The bankruptcy court's award is vacated and remanded with
instructions to enter judgment for the Trustee in the amount of
the commitment fee. The Trustee sought recovery of the commitment
fee which it paid to Access for the Access Revolver, a sum of
approximately $12 million. In post-trial briefing, without
contesting the value of the commitment fee, the defendants
suggested that the Trustee's recovery should be reduced by the
reasonable value of the counter-performance it received. But the
defendants did not specify any method or record evidence with
which to value that performance. The bankruptcy court, after
noting the limited argument from either side, took the defendants'
invitation and decided that the Trustee's recovery should be
offset by the reasonable value of the October Draw. It then
apparently calculated the reasonable value of the October Draw as
$3.8 million, or 40% of the commitment fee. Because the $300
million draw was made on October 15, and was repaid in equal

installments on October 16, 17, and 20, this amounted to an effective annual simple interest rate for the October Draw of approximately 174%, not including the interest Lyondell paid to Access in October for borrowing under the Access Revolver.[6]  This value was not suggested by either party, no support can be discerned for it in the record, and it appears unreasonable as an interest rate for a commercial loan.  This is particularly true here, where the October Repayments included the substantial interest rate dictated by the Access Revolver.  That finding must therefore be vacated.

Remand for recalculation of the award is not required in these circumstances.  The defendants had the burden to prove the existence and amount of any claimed offset.  They failed to do so. Merely suggesting that the bankruptcy court should formulate an offset, without presenting any evidence or method with which to perform that calculation, was insufficient to carry their burden. Having been given a full and fair opportunity to do so below, the

---

[6] Simple interest is calculated through the formula A=P(1+rt), where A is the value repaid, P is the principal value, r is the interest rate, and t is the number of years of the loan period. Under the bankruptcy court's finding, the fair value of the borrowing was $303.8 million -- the amount of the principal borrowed plus the bankruptcy court's calculated benefit. Accordingly, the effective annual simple interest rate can be calculated as:

$$303.8=100(1+r*(1/365))+100(r*(2/365))+100(r*(5/365))$$

reflecting that $100 million was repaid 1 day, 2 days, and 5 days later.  Evaluation of that equation results in an interest rate figure of approximately 174%.

defendants are not entitled to try again.  Therefore, as a matter

of law, the defendants have failed to produce sufficient evidence

to prove the existence and value of any claimed offset, and thus

judgment should have been entered for the Trustee in the full

claimed amount, without any offset.  Accordingly, the judgment of

the bankruptcy court is vacated and remanded with instructions to

enter judgment for the Trustee in the amount of the commitment

fee.

## II.  Avoidable Preference Claim

The Trustee asserts that the October Repayments were

avoidable preference payments, and thus subject to recovery for

the benefit of the bankruptcy estate.  To be avoidable as a

preference payment, the payment must satisfy the requirements of

11 U.S.C. § 547(b); specifically, it must have been:

> 1. to or for the benefit of a creditor;
> 2. for or on account of an antecedent debt
>    owed by the debtor before such transfer was
>    made;
> 3. made while the debtor was insolvent;
> 4. on or within 90 days before the date of
>    filing of the petition . . .; and
> 5. enable the benefited creditor to receive
>    more than such creditor would have received
>    had the case been a chapter 7 liquidation
>    and the creditor not received the transfer.

In re Roblin Indus., Inc., 78 F.3d 30, 34 (2d Cir. 1996).  The

bankruptcy court ruled, and neither party has contested on appeal,

that the relevant debtor for this claim is Lyondell as a stand-

alone entity, and not LBI.  See Trial Opinion, 567 B.R. at 148.

The bankruptcy court also ruled, without objection on appeal, that the Trustee has satisfied each element other than the third element (solvency) as a matter of law. Id. at 118. The Trustee argues that he was entitled to judgment as a matter of law that Lyondell was insolvent as of the October Repayments, and that in any event, the bankruptcy court erred in its factual findings on this issue. For the following reasons, the Trustee's arguments are rejected, and the bankruptcy court's judgment is affirmed.

### A. Statutory Presumption of Insolvency

The Trustee argues that the bankruptcy court improperly failed to accord the Trustee the benefit of the presumption provided by 11 U.S.C. § 547(f). In an avoidable preference action, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). The presumption is rebuttable if the debtor establishes "some evidence" of solvency. On summary judgment, the bankruptcy court ruled, and the Trustee does not challenge on appeal, that the defendants had submitted some evidence tending to support the solvency of the LBI, and that the case therefore needed to be tried. The Trustee, however, now claims that because defendants' proof at trial allegedly failed to match the evidence submitted on summary judgment, the vitality of the statutory presumption should have been reevaluated based on the trial record.

Generally, a district court reviewing the decision of a
bankruptcy court "will not consider an issue raised for the first
time on appeal." Universal Church v. Geltzer, 463 F.3d 218, 228-
29 (2d Cir. 2006); see Adelphia Business Solutions v. Abnos, 482
F.3d 602, 607 (2d Cir. 2007). The Trustee not only failed to
bring this alleged error to the attention of the bankruptcy court,
but also affirmatively agreed that the defendants had no
obligation to produce any evidence establishing solvency,
necessarily implying that the statutory presumption had been
vitiated. At no point after summary judgment did the Trustee ever
argue that he was entitled to the statutory presumption, on either
of the arguments that he makes now: (1) because the summary
judgment record became irrelevant at trial, or (2) because the
trial proof failed to match the summary judgment record. Given
the clear waiver, and affirmative disclaimer, the Trustee cannot
now complain that the bankruptcy court failed to provide the
benefit of the statutory presumption.

In attempting to overcome his waiver, the Trustee relies on
two statements in his closing argument at trial, which he claims
sufficiently alerted the bankruptcy court to his position. They
did not. These statements, which the defendants aptly
characterize as stray comments, failed adequately to appraise the
bankruptcy court that it was the Trustee's position that the
statutory presumption should be revisited.

The Trustee fares no better with the claim that the issue of
entitlement to the statutory presumption was "passed upon below"
so as to come within an exception to the general rule requiring
issues to have been fairly presented to the lower court.  The
passed-upon-below exception provides that, in certain
circumstances, issues that were decided by the lower court may be
heard on appeal, even if a party did not raise that issue in the
lower court.  See generally United States ex rel. Keshner v.
Nursing Personnel Home Care, 794 F.3d 232, 235 (2d Cir. 2015).
The Trustee, however, is not in a position to claim the benefit of
that exception.  The Trustee's acquiescence in the ruling that the
presumption had been rebutted, without calling the alleged error
to the bankruptcy court's attention, constitutes waiver outside
the contours of the passed-upon-below exception.  See Keshner, 794
F.3d at 236; Millea v. Metro North R. Co., 658 F.3d 154, 163 (2d
Cir. 2011).  Accordingly, the bankruptcy court's decision
declining to apply the statutory presumption of insolvency is
affirmed.

### B. The Bankruptcy Court's Factual Determinations

The Trustee also challenges the bankruptcy court's ruling on
the ground that his proof at trial was sufficient to demonstrate
insolvency.  To determine whether a company is insolvent for the
purposes of an avoidable preference claim, courts apply the
"balance-sheet insolvency" test.  See 11 U.S.C. § 101(32); Roblin,

78 F.3d at 35-36; 5 Collier on Bankruptcy § 547.03[5] (16th ed. 2017); see generally 2 Collier on Bankruptcy § 101.32 (16th ed. 2017). Under the "balance-sheet insolvency" test, a court considers whether the fair value of the debtor's assets is greater than the fair value of the debtor's liabilities. Roblin, 78 F.3d at 35-36. At trial, the Trustee's evidence on this issue was primarily provided by Anders Maxwell, his expert witness on valuation. The Trustee also claims that other evidence in the record suffices to establish Lyondell's insolvency as of the date of the October Draw repayments.

It bears noting, however, that the focus of the trial of the avoidable preference claim was on the solvency of LBI in October 2008, not the solvency of Lyondell as a stand-alone entity. In post-trial briefing, the Trustee contended that Lyondell was the appropriate debtor for this claim, and the bankruptcy court agreed. Trial Opinion, 567 B.R. at 148. Nonetheless, Anders Maxwell's testimony focused entirely on LBI. He expressed no opinion whatsoever on the valuation of Lyondell as a stand-alone entity. Only in post-trial briefing was an attempt made to extrapolate the valuation Maxwell provided for LBI to a valuation of Lyondell, without any testimony to support the Trustee's methodology. Although not dispositive of the Trustee's claims here, it does limit the extent to which any errors, even if found, could be deemed reversible. Similarly, the non-expert evidence to

which the Trustee points on appeal represented small portions of the Trustee's factual findings, and were not the focus of the parties' submissions.  Although argument based on this evidence was not, in the main, waived for appellate consideration, the bankruptcy court's failure to address the evidence in detail must be considered in the context of its perceived importance to the case as a whole.

### 1. Anders Maxwell

The bankruptcy court ruled that the Trustee had failed to prove that Anders Maxwell's testimony was reliable, and therefore declined to consider it.  If viewed as an exclusionary ruling under Rule 702, Fed. R. Evid., the ruling would be reviewed for abuse of discretion; if viewed as a factual finding that the testimony is entitled to no weight, it would be reviewed for clear error.  See Restivo v. Hessemann, 846 F.3d 547, 575 (2d Cir. 2017).  A clear error is one that leaves the reviewing court "with the definite and firm conviction that a mistake has been committed."  United States v. Moreno, 701 F.3d 64, 72 (2d Cir. 2012).  The rejection of Maxwell's testimony is upheld under the more demanding abuse of discretion standard, which incorporates the "clear error" standard for factual findings.

The bankruptcy court found that for four reasons, "Maxwell's testimony [was] seriously flawed": his use of December 2008 projections for his valuation of LBI as of October 2008; his use

of an inflated tax rate assumption; his use of only one day of
trading in his comparable companies analysis; and inconsistency
with both his 2009 testimony on behalf of the Creditors Committee
and his trial testimony regarding his December 2007 valuation of
LBI.  Trial Opinion, 567 B.R. at 105.  The Trustee challenges each
of these determinations, which are addressed in turn.

### a. December 2008 Projections

The error the bankruptcy court found most troubling was
Maxwell's reliance on projections first presented to LBI's board
in December 2008 to value LBI as of October 2008, even though it
was undisputed that the fortunes of LBI, and, indeed, the world
economy as a whole, changed dramatically in November and December
2008.  Id.  On appeal, the Trustee primarily argues that the
bankruptcy court erred by failing to accord appropriate weight to
certain evidence showing that at least the initial data for the
December 2008 presentation would have been collected from the
operating units on October 24, 2008.  The bankruptcy court,
however, found that it was highly implausible that the December
projections would have been based on the exact same data as that
provided in October, with no adjustments made in the intervening
six weeks.  Id.  It cannot be said that the bankruptcy court's
finding, based on careful evaluation of and intimate familiarity
with the record, is so clearly mistaken as to merit reversal.
Therefore, there was no reversible error on this ground.

### b. Inflated Tax Rates

Maxwell testified that the standard corporate tax rate should be used in a Discounted Cash Flow ("DCF") valuation. The bankruptcy court found that Maxwell's assumptions in support of that choice were incorrect. At closing argument and on appeal, the Trustee offered new arguments to support the selection of the standard corporate tax rate. Because these arguments were never offered by Maxwell during his testimony, they do not provide a basis for finding Maxwell's testimony to be reliable. Indeed, during cross-examination, Maxwell admitted that the tax rate that should be used was one most closely approximating the company's actual tax rate, rather than the standard corporate rate. Accordingly, it cannot be found on appeal, based on the evidence admitted into the trial record, that the bankruptcy court erred in finding Maxwell's testimony unreliable for using an incorrect tax rate.

### c. Use of One Day of Trading

The bankruptcy court also found Maxwell's testimony to be unreliable on the ground that Maxwell used only one day of trading data in his comparable companies analysis, despite evidence that stock prices were highly volatile in late 2008, creating the potential for this component of the analysis to be unduly dependent on the particular day that Maxwell selected. Id. at 106. The Trustee on appeal cites to an extra-record treatise to

suggest that this was not erroneous, but this argument was not made to the bankruptcy court despite a full opportunity to do so. There was no clear error in the bankruptcy court's finding, based on Maxwell's own testimony, that Maxwell's valuation was unreliable for this reason.

The Trustee also suggests that the bankruptcy court erred in excluding portions of Maxwell's re-direct testimony based on new calculations he conducted after his cross examination, which purported to show that this potential problem with his analysis was immaterial. A decision to exclude evidence for noncompliance with expert disclosure requirements is reviewed for abuse of discretion. See Funk v. Belneftekhim, 861 F.3d 354, 365 (2d Cir. 2017). Rule 26(a)(2)(B)(i), Fed. R. Civ. P., requires that an expert provide "a complete statement of all opinions the witness will express and the basis and reasons for them" before trial. "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Although the bankruptcy court could have allowed Maxwell's new calculations, it certainly was not required to do so in light of their late disclosure. Finding no abuse of discretion, the bankruptcy court's exclusion of Maxwell's re-direct testimony to the extent it relied on new calculations is

affirmed, and its finding that Maxwell's use of one day of trading data was a source of unreliability is affirmed.

### d. Inconsistency with Previous Valuations

Finally, the bankruptcy court found that Maxwell's valuation of LBI as of October 2008 was inconsistent with previous work he had done on behalf of the Creditors Committee in the underlying bankruptcy proceeding, as well as the valuation he provided at trial for LBI as of December 2007. Trial Opinion, 567 B.R. at 106-07. The Trustee asserts that Maxwell provided persuasive explanations for the inconsistencies, which in the Trustee's view the bankruptcy court was compelled to accept. But the bankruptcy court, which heard the evidence and is most familiar with the record, found Maxwell's explanations unpersuasive, and indicative of Maxwell changing his methodology for litigation purposes rather than for legitimate economic reasons. This finding is one that is inherently credibility-based, and therefore is owed special deference by a reviewing court. In any event, Maxwell's and the Trustee's explanations are not so compelling as to merit reversal.

### 2. Non-Expert Evidence

The Trustee also asserts that other evidence in the record, particularly a SEC form 10-Q Statement ("10-Q") showing Lyondell's financial condition as of September 30, 2008, is sufficient to support a finding that Lyondell was insolvent as of mid-October 2008. The bankruptcy court did not analyze the 10-Q in its

findings, despite the Trustee briefly mentioning the 10-Q in its proposed findings of fact.

The bankruptcy court's judgment on this issue is affirmed. The Trustee is correct that, on its face, the 10-Q shows a negative value for Lyondell's stockholders equity.  But the 10-Q, by itself, is far from sufficient to show by a preponderance of the evidence that Lyondell was insolvent as of October 2008.  In order to conduct the balance-sheet insolvency inquiry as described in Roblin, one has to calculate the fair value of the assets against the fair value of the liabilities.  Roblin, 78 F.3d at 35-36.  A balance sheet in a 10-Q statement, which shows the "book value" of assets and liabilities, can be a useful starting point for such an inquiry, but, absent unusual circumstances, is not its endpoint.  Id. at 36.  Roblin emphasizes that the relevant value for the balance-sheet insolvency inquiry is "fair value," the value that a purchaser in the marketplace would ascribe to the asset or liability, not "book value."  Id.

The two values can sometimes vary dramatically.  Id.  For example, on inspection of the balance sheet contained in this 10-Q, at least some of the liabilities appear to be contingent liabilities, not direct liabilities of Lyondell, or otherwise may have been fairly valued at different values than their face amount.  Nor is the Trustee's attempt to pick away at one component of Lyondell's assets, the "Goodwill" entry, persuasive.

As the bankruptcy court found, there were significant negative events affecting Lyondell and LBI in November and December 2008, which would have been at least partially responsible for its later write-off.

Regardless, the burden was on the Trustee to explain why the negative stockholders equity value on the balance sheet showed Lyondell's insolvency as of October 2008. This it has altogether failed to do, either in the bankruptcy court or on appeal.[7] That is not surprising in light of the focus of the Trustee below on Maxwell's testimony, and on proving the insolvency of LBI rather than Lyondell on a stand-alone basis. On a claim of this magnitude and complexity, the Trustee had to come forward with far more than an equivocal 10-Q to carry its burden of proof. Accordingly, there is not a fair basis to conclude that the 10-Q statement alone shows insolvency by a preponderance of the evidence.

The Trustee's other contentions based on the non-expert record have been considered and are deemed unpersuasive. Accordingly, the judgment of the bankruptcy court on the avoidable preference claim is affirmed.

_____

[7] For example, the Trustee's reliance in this appeal on the Citibank valuation from December 2007 to show the value of Lyondell's assets is not fairly preserved because the Trustee never even mentioned it to the bankruptcy court.

**CONCLUSION**

The judgment of the bankruptcy court is vacated and remanded with instructions to enter judgment for the Trustee in the amount of the commitment fee for the Access Revolver, without offset.  In all other respects, the judgment is affirmed.

Dated:    New York, New York
          January 24, 2018

_____
                DENISE COTE
        United States District Judge